AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

**FILED**

**United States District Court**
**Albuquerque, New Mexico**

for the

District of New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>SAMSUNG GALAXY S9+ CELLULAR TELEPHONE<br>MODEL SM-G965U1<br>IMEI NUMBER: 358140096359536 | )<br>)<br>)<br>)<br>)<br>)    Case No.   **24mr2126** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated by reference.

located in the _____ District of ____New Mexico____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1112 | Voluntary manslaughter; |
| 18 U.S.C. § 1153 | Offenses Committed within Indian Country. |

The application is based on these facts:

See attached affidavit and attachments.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Chirstopher Lopez, F.B.I Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Electronically subscribed and telephonically sworn__ *(specify reliable electronic means)*.

Date: ___November 19, 2024___

_____
*Judge's signature*

City and state: ___Albuquerque, New Mexico___

The Honorable John F. Robbenhaar, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF SAMSUNG GALAXY S9+ CELLULAR TELEPHONE, MODEL SM-G965U1 IMEI NUMBER 358140096359536, CURRENTLY LOCATED IN AN EVIDENCE ROOM AT 4200 LUECKING PARK AVE NE, ALBUQUERQUE, NM 87107, WHICH IS THE ALBUQUERQUE OFFICE OF THE FEDERAL BUREAU OF INVESTIGATION | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Christopher Lopez**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a full-time salaried sworn law enforcement professional employed by the Bernalillo County Sheriff's Office ("BCSO"). I have been employed by BCSO since 2015 and graduated from BCSO's Regional Police Academy in December of 2015. I was assigned to the Field Services Division where I served as a patrol deputy where I primarily responded to calls for service in the unincorporated areas of Bernalillo County.  In October of 2019, I was promoted to a detective position within the Violent Crime/Homicide Unit in the Criminal Investigations Division. In this position I was tasked with investigating violent criminal offense as well as weapon

offense, I also investigate deaths that occur within Bernalillo County and law enforcement involved shootings. In November of 2023, I became a member of the FBI Violent Crime Task Force of the Albuquerque Division.

3.      As a Task Force Officer, I am authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of Federal criminal laws.

4.      Over the course of my career, I have arrested several hundred persons for offenses related to drug possession, assault, armed robbery, homicide, firearm violations, and other crimes. I have completed training provided by the New Mexico Regional Computer Forensics Laboratory related to securing, extracting data from, and examining electronic devices. I have conducted data extractions and examinations of numerous digital devices utilizing Cellebrite. Cellebrite is a specialized tool which allows for the retrieval of digital data stored on personal electronic devices such as a tablet or cellular phone. I have reviewed and analyzed the information obtained from these extractions, which aided in the investigative process.

5.      This affidavit is based on information obtained from, interviews, witnesses, surveillance, and FBI and Isleta Police Department investigators who have participated in this investigation.

6.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe a violation of Titles 18 U.S.C. §§ 1153 and 1112 – Offenses Committed within Indian Country and Voluntary Manslaughter, has been committed upon victim John Doe. There is also probable cause to search the item described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

7.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.    The property to be searched is a SAMSUNG GALAXY S9+ CELLULAR TELEPHONE MODEL SM-G965U1, IMEI NUMBER 358140096359536, hereinafter the "Device." The Device is currently located in an evidence room at 4200 Luecking Park Ave NE, Albuquerque, NM 87107, the Albuquerque office of the Federal Bureau of Investigations, Albuquerque, New Mexico.

9.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B. This application seeks a warrant authorizing law enforcement officers working this investigation to search all responsive records and information associated with the Device for evidence pertaining to violations of Title 18 U.S.C. §§ 1153 and 1112 – Offenses Committed within Indian Country and Voluntary Manslaughter.

## PROBABLE CAUSE

10.    The FBI and Isleta Police Department are currently investigating the unattended suspicious death of C.H., Year of Birth ("YOB") 1977, an enrolled member of the Navajo Nation (hereinafter "Jane Doe"), which occurred on or about October 30, 2024, at the Isleta Resort and Casino, located at 11000 Broadway Blvd SE, Albuquerque, New Mexico 87105, which is within the exterior boundaries of the Isleta Pueblo. Based on my participation in the investigation, I believe the Device may contain evidence of a crime.

3

**Death Investigation**

11.     On October 30, 2024, at approximately 2:50 a.m., under the direction of Jane Doe's son, Elijah YAZZIE, Jane Doe's significant other, Christopher YAZZIE called from their hotel room to the hotel's front desk, to report his wife was locked inside of the restroom and was unresponsive with attempts to communicate with her. Isleta Resort and Casino security responded to the room and used a tool to unlock the bathroom door. When the door was opened Jane Doe was found unresponsive in the bathtub with the entirety of her body, except for her head submerged in water. Elijah YAZZIE and the security officer removed Jane Doe from the tub, and life-saving efforts were performed. Medical personnel arrived to the scene, and took over life-saving efforts but were unsuccessful. Jane Doe was declared deceased on scene by paramedics. The hotel room was secured, and both Christopher YAZZIE and Elijah YAZZIE was escorted to another location in the hotel where they were monitored by security staff. Isleta Police Department detectives and well as FBI personnel were requested to the location to provide assistance with the on-going investigation. During the course of the investigation detectives observed Jane Doe had a laceration over her right eye which appeared to be fresh.

12.     A review of surveillance video from the hotel revealed Elijah YAZZIE, Christopher YAZZIE, and Jane Doe were the only subjects in the room at the time of the incident. Surveillance also revealed that Jane Doe had no laceration over her eye when she last entered the room.

Therefore, investigators determined the laceration to the area above Jane Doe's right eye resulted after entering the room for the night.

**Interview of Elijah Yazzie**

13.     On October 30, 2024, at approximately 11:17 a.m., FBI Special Agent (SA) Dan Fondse and I conducted an interview with Elijah YAZZIE. Prior to speaking with Elijah YAZZIE, he was informed he was not under arrest, that he was free to cease questioning and leave at any time, and that the interview was consensual. Elijah YAZZIE agreed to speak with SA Fondse and me.

14.     Elijah YAZZIE stated on Sunday October 27, 2024, he, his father (identified as Christopher YAZZIE), and his mother, Jane Doe, had come to Albuquerque from Arizona for a work conference Jane Doe was attending. Elijah YAZZIE tried to detail the day's events leading to his mother's death but he had difficulty providing an accurate timeline of events during the interview. When asked to providing clarifying information, he would either add information or omit statements he had previously provided.

15.     Elijah YAZZIE stated on the night of October 29, 2024, he walked from the hotel to a nearby convenience store to purchase alcohol for himself. When Elijah YAZZIE returned to the room, his parents were gone, and he determined they had gone to the casino floor to gamble. Elijah YAZZIE said he stayed in the room and began drinking the alcoholic beverage he purchased at the store. Sometime later, Christopher YAZZIE called Elijah YAZZIE and asked him to bring them back to the room. Elijah YAZZIE went down to the casino and contacted his father. Elijah YAZZIE stated he observed his mother going to the restroom, so he took his father back to the

room. Elijah YAZZIE came back down to the casino floor, contacted his mother, and brought her back to the room.

16.    After returning to the room, Elijah YAZZIE stated his mother left and returned to the room two or three additional times. Elijah YAZZIE said he thought his mother had gone back to the casino to have more drinks.

17.    Elijah YAZZIE said his mother went to sleep on the bed, his father went to sleep on the floor, and he went to sleep on the rollout bed that was provided by the hotel. Elijah YAZZIE said he woke up some time between 12:00 a.m. and 01:00 a.m. and observed his mother walking into the bathroom holding a change of clothes. Elijah YAZZIE said he was tired, so he went back to sleep, awaking again at approximately 02:00 a.m. When he woke up, he asked his father where mom was and asked if she was in the bed. When they discovered she was not in bed, Elijah YAZZIE began knocking on the bathroom door. When this did not elicit a response from Jane Doe, Elijah YAZZIE said he told his father to call security.

18.    Security arrived and according to Elijah YAZZIE unlocked the bathroom door. Jane Doe was found nude and unresponsive in the bathtub. Jane Doe was removed from the bathtub and life saving measures were administered but were unsuccessful.

19.    When asked what he thought happened to his mom, Elijah YAZZIE said he did not know, but went on to say his mom did suffer from heart problems and took medication for the issue. Elijah YAZZIE did not know the specific issue but said his mom had run out of her

6

prescription before they left for the trip. Elijah YAZZIE also stated his father and mother took the same medication, so his dad had given Jane Doe some of his pills while on the trip.

20.     SA Fondse and I began a series of follow-up questions for Elijah YAZZIE, specifically focusing on the events of Tuesday, October 29, 2024. Elijah YAZZIE stated after his mother came back to the room upon the conclusion of the conference for the day, they all watched movies and used their personal electronics. The group ate dinner and afterwards, around 08:00 p.m., they went to the casino. They stopped at the bar and purchased a round of drinks. They gambled for an unspecified period and went back to the bar for another round of drinks. When they finished their drinks, they went back to the room.

21.     Elijah YAZZIE stated he was confused about which day he was describing and believed the events may have occurred on Monday, rather than Tuesday. At this point SA Fondse provided Elijah YAZZIE with sheets of paper so he could write out his statement. As Elijah YAZZIE wrote his statement across multiple sheets of paper, he spoke aloud but primarily to himself.

22.     As Elijah YAZZIE spoke detailing the events of Tuesday, October 29, 2024, he disclosed his mother was sitting at the bar speaking with an unknown male. Elijah YAZZIE had not disclosed his mother was with another male during his initial statement. ELIJAH Yazzie went on to state that upon bringing his father back to the room, Christopher YAZZIE laid down on the floor and went to sleep. When questioned if this was a result of his level intoxication, Elijah YAZZIE denied this, and informed SA Fondse and me that his father enjoyed sleeping on the floor. Elijah YAZZIE brought his mother back to the room, and upon seeing Christopher YAZZIE on the floor, she inquired if he was okay. This led me to believe the behavior of Christopher YAZZIE

7

sleeping on the floor was not normal as Elijah YAZZIE had indicated. Elijah YAZZIE alleged his mother then left the room an additional two times, leaving for approximately 15 to 20 minutes at a time. Elijah YAZZIE did not know where she went but thought she may have gone back to the bar. It should be noted upon subsequent review of the hotel's surveillance by other assisting Agents the investigation, it was determined Jane Doe did not leave the room as Elijah YAZZIE alleged. Elijah YAZZIE maintained he witnessed his mother go into the bathroom with clothing, stating he went back to sleep and awoke approximately an hour later and discover his mother was still in the bathroom.

23.     When I first contacted Elijah YAZZIE, I observed what appeared to be fresh scratch marks on his right forearm. When asked about the injury, Elijah YAZZIE stated it was from a fall approximately one week prior. Elijah YAZZIE said he and his mother were lighting fireworks in the mesa near their home in Arizona. Elijah YAZZIE said it was dark and he had fallen. Elijah YAZZIE was unable to elaborate what caused the scratch marks.

24.     Upon completion of the interview with Elijah YAZZIE, SA Fondse and I spoke with assisting Agents who had conducted other investigative duties to include interviews and reviewing video surveillance. As we briefed with the other Agents we learned Christopher YAZZIE admitted to a verbal argument in the room between Elijah YAZZIE and Jane Doe. As mentioned previously video surveillance refuted Elijah YAZZIE's statement regarding his mother leaving the room multiple times.

25.     Based on the new obtained information, SA Fondse and I conducted a follow-up interview with Elijah YAZZIE. At approximately 02:29 p.m. SA Fondse and I informed Elijah YAZZIE we had additional questions we needed answered. Due to this being the second interview

8

with Elijah YAZZIE and the fact we knew he had provided misleading and untruthful statements, Elijah YAZZIE was informed of his Constitutional Rights per *Miranda v. Arizona*, to which he stated he understood and agreed to speak without the presence of legal counsel. Elijah YAZZIE did sign an advisal of rights prior to being questioned. Elijah YAZZIE was confronted with the discrepancy regarding his mother leaving the hotel room after returning for the night after being at the bar. Despite video surveillance disproving this statement, Elijah YAZZIE continued to state his mother had left the room an additional two to three times. Elijah YAZZIE admitted he was mad at his mother for her behavior. Elijah YAZZIE went on to describe how his father soiled himself and his mother was the first to notice when she came in the room at approximately 12:30 a.m. on Wednesday October 30, 2024. Elijah YAZZIE provided multiple variations of this incident stating his father was asleep as he changed him but then later amended his statement to state his father was awake. Elijah YAZZIE also initially stated he wanted to wash his hands after, but that his mother was already in the bathroom. Elijah YAZZIE then changed his statement again to say his mother was not in the bathroom at the time but elected not to wash his hands at the time. Elijah YAZZIE continued to provide statements and then amend them. Based on my experience in law enforcement investigative casework, subjects who are being deceptive will provide multiple accounts due to having to make the information up as they go. This makes it difficult for a subject to recall what information they have previously provided and can cause a subject to provide different versions of events as they are asked to provide information more than once. Elijah YAZZIE was again confronted about the scratch marks on his right forearm. As SA Fondse began to voice his concerns regarding the scratches, Elijah YAZZIE motioned at his arm using his left hand and made a scratching motion. Elijah YAZZIE stated, "My mom didn't scratch me." When

9

questioned if he and his mother had ever been involved in a physical altercation, Elijah YAZZIE stated no but admitted to physically removing his mother from their house on numerous occasions due to her being intoxicated and causing a disturbance. The latest incident occurred within the past two weeks.

26.    I noticed the collar of Elijah YAZZIE's shirt was stretched out and there were portions of the fabric that were ripped. In my training and experience, clothing exhibiting those characteristics is indicative of a physical altercation. I asked if the subject had been in an altercation that night and Elijah YAZZIE stated the shirt was old and was not torn as a result of a physical altercation.

27.    Elijah YAZZIE provided multiple accounts of the incident on the night of his mother's death, some of which could be refuted by video surveillance. Elijah YAZZIE had what appeared to be defensive wounds to his person and was not able to provide a reasonable detailed explanation for.

28.    I know through my involvement in this and prior investigations of homicides, that suspects may conduct internet searches related to investigative procedures related to the crime. They may take photographs of the scene. They may compose messages, emails, or social media posts admitting to their involvement. They may search for penalties associated with the crime. Elijah YAZZIE stated he had been watching videos and utilizing various social media platforms on his cellular phone. From my experience and training the device would likely contain logs which

could confirm or refute statements provided by Elijah YAZZIE and could assist in determining if the device was active during times when Elijah YAZZIE stated he was sleeping.

29.    The Device is currently in the lawful possession of the FBI Violent Crimes Task Force.  It came into the FBI Violent Crimes Task Force's possession in the following way:  The device was taken during the execution of an arrest warrant of Elijah YAZZIE.  Therefore, while the FBI Violent Crimes Task Force might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

30.    The Device is currently in storage at 4200 Luecking Park Ave NE, Albuquerque, New Mexico 87107.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI Violent Crimes Task Force.

## **TECHNICAL TERMS**

31.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from

11

the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS")

12

consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13

32.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.samsung.com/us/mobile/phones/galaxy-s/galaxy-s9plus-64gb--unlocked--sm-g965uzkaxaa/, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

34.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      f.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

14

g.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

h.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

i.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

37.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

38.     This affidavit has been reviewed by Supervisory Assistant United States Attorney Alex Flores.

Respectfully submitted,

Christopher N Lopez
Task Force Officer
FBI

Electronically subscribed and telephonically sworn
on November 19, 2024:

THE HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

16

**ATTACHMENT A**

The property to be searched is a SAMSUNG GALAXY S9+ CELLULAR TELEPHONE

MODEL SM-G965U1, IMEI NUMBER 358140096359536, hereinafter the "Device," which is

pictured below. The Device is currently located at THE ALBUQUERQUE FEDERAL BUREAU

OF INVESTIGATIONS EVIDENCE ROOM, IN ALBUQUERQUE, NEW MEXICO.

This warrant authorizes the forensic examination of the Device for the purpose of

identifying the electronically stored information described in Attachment B.






**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of Title 18 U.S.C. §§ 1153 and 1112 – Offenses Committed within Indian Country and Voluntary Manslaughter and involve **Elijah YAZZIE** between **October 27, 2024** and **October 30, 2024**, including:

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2